May it please the Court, good morning, my name is Jeff Byrd, I'm here representing the National Labor Relations Board, and in this case the petitioner, Regional Director Henderson, listed in the caption of the case. Your Honor, in this case the District Court denied the Regional Director's request for preliminary injunctions against Greenbrier Hospital as well as Bluefield Hospital, resting its decision exclusively on whether or not there was a likelihood of irreparable harm. Having found none, the judge just denied the injunctions without considering the other factors set forth in Winter. As we set forth in our brief... After Winter, can you get a preliminary injunction if you fail to show there would be irreparable harm? No, Your Honor, and that's certainly not the Board's position. The Board's position is twofold. The first is that it's only by considering the other factors that it sheds light upon the irreparable harm that occurred in a situation such as this where companies refused to bargain in good faith as is their obligation under the National Labor Relations Act. This is because under the... Within the context of 10J of the Act, which is what permits the Regional Directors to seek preliminary injunction for violations of the Act while Board proceedings occur, there are... The public... It's primarily due to the public interest that is... ...declared and the Supreme Court has affirmed exist in cases such as this involving the accusations or allegations of refusals to bargain in good faith. Congress set forth in the opening section of the National Labor Relations Act that it is declared to be the policy of the country to encourage collective bargaining agreement recognizing that it is through collective bargaining and other forms of... Federal court that would have the authority to grant an injunction has to separately review each of the four elements under Winter and then do some sort of a totality analysis that sees if each of those individual elements... No, Your Honor. I don't... ...one or the other. Because I'm kind of confused as to, you know, the... ...calculated these four items out, why... Once the court's made a finding on a necessary element like irreparable harm, what's the point in going on after that? Yes, Your Honor, and I'll respond to both parts of your question if I may. The first is that the Board is not advocating a specific structure. Of course, it's not for the Board to tell the district court exactly how it should adjudicate its cases. However, in determining whether there's irreparable harm, the interest at state and the statutory rights that are at state need to be considered or we have a situation such as we have here where a district court took a very limited view, essentially treated this as a private dispute between a few employees and their employer while ignoring the important public interests that are at state. Now, while the balancing of the public interest does come at a different portion of the analysis under Winter and is a different factor, without appreciating those public's interests... Well, essentially, the public interest is in the good-faith bargaining and the avoidance of industrial strife as Congress set forth in the Act. Without that good-faith bargaining, the concomitant harms that occur and the likely irreparable harms are important ones that, in this case, the district court ignored. As I said, the Congress recognized that good-faith bargaining exists to avoid the type of industrial strife and unrest that plagued the industrial world 80 years ago and saw that as the avenue to avoiding the types of obstructions of commerce that Congress was looking to avoid. Now, when the Supreme Court, a few years later, declared that the National Labor Relations Act was, in fact, constitutional, it acknowledged that collective bargaining is a fundamental right that employees enjoy that is guaranteed in Section 7 of the Act and protected in Section 8 of the Act. These are the types of considerations that the district court ignored here. However, we're not maintaining that it is simply these larger public interests that were ignored. We think that that standing alone requires reversal of the district court's decision here, but there also is a plethora of evidence that, frankly, the district court just got wrong in what was going on here at the properties of Bluefield and Greenbrier that varied a and have occurred at a number of other properties owned by the same group that have resulted in 10-J injunctions, including the case against DHSC Affinity that we notified the court about in a 20-J letter last week that came out of the Northern District of Ohio. The import of that decision and others like it is to show that this is the type of conduct that has warranted injunctive relief elsewhere and that, in fact, warrants injunctive relief here. But, unfortunately, the district court took a very limited view of the evidence and ignored much of it in finding that there was not a likelihood of irreparable harm, that there was not the type of erosion of employee support for the union that, in fact, is going on at this property. A few examples, it references hand-billing that went on at Bluefield with the indication that the court gave the indication that because there was some hand-billing that was going on, this is a show of support, this is a communication or interaction between the union and their members. However, most of the hand-billing at issue, as the record shows, occurred in 2013, which is where the bad faith bargaining occurred here, which took place primarily in 2015. There was a reference to the fact that union members were speaking at a conference. I guess this is to show that speaking at a conference shows that there were an active union, that the members would see this and still support their union. However, there's no reference to speaking at any conference in the record. So this is simply a fact that the district court got wrong. There was some discussion about attending meetings and delivering letters. However, the record shows that there were only two instances in which bargaining committee members delivered letters about the suspension of another nurse. And this is a critical fact because the district court relies heavily on what happened with few bargaining committee members to show an overwhelming degree of support and no likelihood of irreparable harm. However, it is, of course, the bargaining committee members that are going to be the strongest advocates at the property of what's going on. This ignores what's going on with the rank and file. What's going on with the rank and file, as the evidence shows, is there were expressions of frustration about the progress of negotiations and about an inability to bring about a successful resolution of negotiations. This came out in Greenbrier, in the case of Greenbrier, where one employee, one nurse, R.N. O'Brien, left employment because, as she stated in an affidavit in the record, she left her employment because of the uncertainty that was going on at the property, the changing terms and conditions of employment. Now I believe that... I'm leaving because I drive an hour to get to work and I want to be working somewhere closer to where I live. I'm leaving because I'm getting a pay raise. And I think... Ms. O'Brien. I believe that if you continue reading the affidavit, it goes on in the next few sentences to state that she, to clearly state that she would not have looked for other employment had the situation not been in such flux at the hospital. So there may have been certain... There may certainly have been other reasons why she ultimately left, but she does make it quite clear that it was because of the uncertainty, the shifting terms and conditions of employment that... Well, more pay and closer to work would seem to be pretty important. She then goes on to say nurses continue to wear union buttons at work to show support for the union. I still do, but I never paid attention to how many of us were doing this. Frankly, I have to say with some of these affidavits, including Ms. O'Brien's, I thought they were evidence that was put in by the hospital instead of by you. Well, these are... I mean, this is the evidence that, again, some of the affidavits involve the bargaining committee members and the discussions of what occurred. And the board is not there to cherry pick the evidence. I mean, if this is what the individual is saying, it's what they're saying. However, we feel that fairly read, they do show expressions of frustration. They show an indication of someone who left for multiple reasons. But as she said, she would not have looked but for this type of situation that's going on at the property. Now, the court in, I believe it was Williams Enterprises and NLRB versus Williams Enterprises has discussed the fact that the unlawful refusal to bargain disrupts employees' morale, deters their organizational activities, and discourages their membership in unions. Now, these are the very rights that Congress gave to... I thought, though, that this is all right, and these are all general policies for arbitration and the national labor policy, but a 10-J injunction, I thought, was allowed only, according to our Muffley opinion, to preserve the remedial power of the board. Yes, Your Honor. In other words, this is all stuff that the board can take care of unless the remedial power of the board is being eroded. And I don't see why the district court abused its discretion in concluding that, and that's where it really led to, is that the remedial power of the board is not being undermined. The board can handle all this well. It's got a broad array of remedies it can take care of, and what you would be doing if you ordered the parties to bargain in good faith, you couldn't say anything more detailed. You would have day-to-day calls from the arbitration parties to the court saying they're not bargaining in good faith. This isn't... They didn't carry on or respond appropriately, and you all of a sudden now transfer the entire And unless there's a real threat to the remedial power of the board, the courts have left that alone, and that's really a discretionary function the court looked at. Your Honor, I disagree that it does not impact the courts, or the boards, excuse me, the ultimate remedial authority. The board's ultimate authority in cases such as this is to issue a forward-looking bargaining order requiring that the company carry its obligations under the act of bargaining in good faith. However, what's happening in the meantime is with the ongoing erosion of support from the members of the union, what that does is it projects clearly to the employees that the union doesn't have power here, that the company is controlling the strings. The company gets to say when it bargains and seeks to bargain terms that are frankly never acceptable in these type of situations, some of which involve seeking to not go forward unless there's an indemnification agreement, which is a permissive subject of bargaining, which is clearly unlawful under the National Labor Relations Act. Well, what's your best evidence of non-remedial damage to the union here? It's... Your best evidence? Our best evidence is, I mean... And it's not Nurse O'Brien, so who's your best evidence? Well, I mean, I think that it's the totality of the evidence that both was wrong by the district court and ignored by the district court about expressions of frustration about how things were going, as well as I will fall back on, and it is no small thing, the broad public interest in preserving the integrity of collective bargaining that is being damaged here. Well, that's going to be true. That's going to be true in every case that involves a collective bargaining agreement where there's some sort of dispute. So what I would like for you to tell us is what's your best evidence that proves, in effect, that there's irreparable harm here without an injunction? It's statements such as those by the court in Williams about the effect that bad faith bargaining inevitably has on a workforce, and that is to show this type of lack of support that once the board issues a bargaining order, at that time, the eroded support means that they are not in the position that they were. Here I should also have been remiss not to mention the fact or point out that this is contracting over a first contract. This is a relationship that it's in its infancy where courts have said this is a time when employees are most susceptible to lose support for the union that they just voted for. And without stemming the tide of what's going on at the property, by the time that a bargaining order may issue, which may be years from now, the loss of support will be something that the employees will believe that nothing has been accomplished. That for example, in the case of nurse Hoffman Jackson, that even though the company is clearly obligated to bargain post-discharge, over her discharge, and to furnish information about her discharge, in this case, the hospital simply said no, simply refused to do so, and the union is powerless to do anything about it. Ultimately, down the road, could they get that type of information under a bargaining order? It's possible. By then, the damage has been done. They've seen that if they're discharged, the union is unable to go in and talk to the hospital because the hospital has simply put its foot down. So it's this type of damage that is occurring now and will likely continue to occur as time goes by, and that once a bargaining order issues, it is indeed irreparable. These are, you know, sentiments that cannot be taken back. At that time, the union will not be in the position it was in at the time that it won the election and was certified by the board. It is the board's ability to remedy problems, and I gather that's ongoing right now? You mean the prosecution of Denver Labor Practices? That is ongoing. It has not reached its conclusion at the trial stage before an administrative law judge. Once that is concluded, it will then go, presumably, will end up before the board for a decision, and it is throughout that lengthy process, which Congress has recognized. It doesn't seem to me like there's any indication, except this frustration, which has not resulted really. There's no real threat of a minority union being imposed. Well, Your Honor, that would require the union or the board to wait until there's a fruition of the unfair labor practices of the bad faith. Well, there is, but that's what the agency process is addressing. In other words, the question is why transfer that process from the agency to a court when the agency is taking care of that, and the cases seem to say that only if there's evidence that the board is being deprived of its remedial power. That's the word we used, I think, in Muffley. Well, but the remedial power is for the board, at some point when it comes time to issue its order, to place the parties back in the position that they were in to say that you shall bargain going forward. However, the leverage in that bargaining relationship has tipped decidedly to date and will continue to tip in favor of the company, allowing the company to benefit from its own wrongdoing here, by stymieing the union's efforts to engage in collective bargaining, and the important part, I'm referencing the union, but by doing so, depriving employees of this right that the Supreme Court acknowledges their fundamental right. So it is a bit different in the 10-J context about the type of right that we're talking about, and we feel that by ignoring any discussion, and I think you'll see this from the district court decision, any discussion of the type of public rights that Congress declared that the Supreme Court acknowledged, that losing those rights is- But you're not losing them. You just have to exercise them in the agency, as opposed to in the court. I mean, if you tell them, issue a court order, and tell them, bargain in good faith, tomorrow you'll be right back in the court and arguing, is this good faith? And two days later, you'll be again, is this good faith? That's exactly what the board is doing. Well, as far as whether or not the general counsel or the region would come back into court or in the district court, I mean, that's not something I can speculate. I don't believe that's something that happens fairly frequently. No, these injunctions don't issue very frequently because there is the process. Congress did create a process, and you're participating in it, and the process, nobody suggested that the process has been damaged. Well, I mean, we are suggesting that the process, it isn't in the process of being damaged, because by the time, the board's remedial authority is to order the parties to bargain going forward. But if there's essentially no bargaining relationship or such a weakened state of affairs by the time that happens, that does impact the court's authority, and that is something that can be stopped at this point, but only by this court. The board cannot tell the hospitals any more than it has or is attempting to achieve through its unfair labor practice proceedings. What was the margin of victory at the Big Art Hospital? I believe it was by about 30 votes, but that is my memory. I could be wrong. I believe it's in the record. I'm sorry, I don't have a more accurate count for you. Well, I will also, just as a final note, I know my time is up, but I would also point out that the district court also found that the general counsel was the principal catalyst of delay in this case.  The general counsel's office acted quite swiftly in investigating charges once they came in, issuing a complaint several weeks later, or seven weeks later, excuse me, was then involved in conducting initial or additional investigation over the merits of the case and whether a 10-J petition was appropriate. And during this time, the hospital did not participate in the investigation, chose to put forth an argument that the board would be barred or the general counsel would be barred from litigating these charges, forcing the general counsel to engage in other early litigation with the administrative law judge about whether or not these charges should be brought. So I think that just shows another example of how the district court simply got it wrong and the totality. When was the charge filed? January? It was charged in January, I believe January 20th. And you filed your application for an injunction in what? In July of that year. Now, but the triggering factor for the injunction is not the issuance or the filing of charges, but it's the issuance of the complaint by the general counsel. Until that happens, there is no ability to file a petition under 10-J. So that happened on March 10th. And that is... Well, why did you wait until July? Well, because different considerations go into whether... I mean, the only thing you could get is an injunction, right? That's why you filed the complaint, get an injunction. No, I mean, the complaint is what initiates the administrative process that is ongoing before an administrative law judge. So when the complaint goes out, and along with the notice of hearing, that alerts to the parties to the fact that the general counsel found some merit and is going to proceed to gather evidence and to trial. I think the district court was somewhat baffled by why you waited to go get an injunction so long. This has been ongoing even before the unfair labor practice was filed. Well, I understand that that's a point that they made, and I think the district court said that the general counsel... Well, the court did find that it was troubled by the delay. It didn't base it on that reason. Well, it might not have based on that reason, but one misunderstanding, just as a factual matter or a procedural matter, is it wasn't up to the board. The general counsel could not have come into the Southern District of West Virginia back in 2015 when this bargaining was going on because there were no charges pending before the board. The charges were filed in January, and again, that's not the triggering event. It's the issuance of the complaint, and the general counsel... I don't think she could have filed the complaint earlier, too. Well, I mean, the complaint could have come a bit closer to January 20th, but the general counsel has an obligation to investigate charges and to determine... I understand, but I'm just trying to... It's not quite as one-sided as you say that court had a basis for making the observation. I don't think there's any evidence that it bases the decision on that. It was just noting that you weren't necessarily all clean hands. There was some delay on your part, and you could have moved quicker if you're protecting a process. Your Honor, I still would disagree. I would suggest that in the brief, there are cases that show what other types of delay look like, and in this case, given the complexity of these cases and the difficulty of investigating them, the board did act quite swiftly or the general counsel did act quite swiftly in the case, and so I think it was just a simple mistake to find that there was that type of delay. But I do recognize what you're saying. As I said, and I will wrap up with this, the general counsel looks at other cases when we cite other cases in the circuits in which courts have elected to or decided that the four equitable considerations from winter are how to adjudicate a 10-J dispute because there are still other circuits that have followed a different approach, wrapping in the winter factors but looking at just and proper and whether an injunction would be just and proper and whether there's reasonable cause. And in those other circuits, which is primarily referring to the Seventh and Ninth, it acknowledges that the harm to the public that is occasioned by this type of bad faith bargaining in itself is a reparable harm and is likely to cause a reparable harm in the absence of an injunction. And we believe that that, combined with the evidence that we presented of the individual and unique harm that went on in each of these properties, is more than sufficient to establish the winter factors and that the District Court abused its discretion in not acknowledging the public interest and in its analysis of those facts. So I'll thank you, Your Honor. Thank you, Counsel. Ms. Gacetta? Good morning, Your Honors. May it please the Court, Caitlin Gacetta, arguing on behalf of Bluefield Regional Medical Center and Greenbrier Valley Medical Center. And I'll refer to those collectively as the hospitals. Today, the hospitals come before this Court asking that this Court affirm the ruling of the United States District Court for the Southern District of West Virginia, finding that the Board had not established the necessary irreparable harm for the District Court to grant the petitions for injunctive relief requested by the Board pursuant to Section 10J of the National Labor Relations Act. As Your Honors have pointed out to my esteemed counsel from the Board, the standard under winter is that each factor must be satisfied. The District Court did not abuse its discretion in deciding to start with the irreparable harm factor here. And it was not necessary, once the District Court concluded on the basis of the evidence in the underlying record, that the Board could not establish irreparable harm. Furthermore, an analysis of the facts in that underlying record illustrate that the District Court did not commit clear error in its analysis of facts in the record. And finally, the Board has not shown that the non-monetary harms it cites are properly remedied in any way by injunctive relief, as Judge Niemeyer pointed out. It doesn't necessarily serve the interests of the Act to move a dispute that's so clearly within the purview of the agency, who routinely, and in numerous cases that I could cite if requested, has said that the agency is the best arbiter of questions about bargaining and what constitutes good-faith bargaining. Has your client been told to bargain in good faith with the union? No, because there hasn't been a petition here. We know that we have to bargain in good faith pursuant to the National Labor Relations Act, and we would contest that any of the bargaining that's happened so far has been bad-faith bargaining. So you think what you're doing now, or have been doing, is good faith? Yes, and we think a full record would establish that. So the only way that the Board would have to do is to come to somehow put more teeth to what they've already told you? Which is precisely what they would do by adjudicating the charges by way of a complaint and a full hearing, which would afford the hospital's due process to enter evidence regarding these questions of alleged bad-faith bargaining. And then the Board has extensive remedial authority, as cited in our briefs, to not only just go ahead and say, you've got to bargain in good faith going forward, but also to require other types of remedial steps, like the reimbursement of bargaining expenses or MARJAC bans on decertification of a union. So the Board is not limited. It definitely has the ability and the teeth, and it exercises those teeth in cases where, again, a full adjudication has taken place and the facts have been established to show that there was actually a violation of the act. So when the merits play out, there are opportunities. But the injunction is to preserve something, right? Yes. And that is the idea Congress has decided many, many years ago. And I think courts have understood and confirmed that collective bargaining is encouraged in this country as a national policy. Yes, Your Honor. Is that right? Yes, Your Honor. All right. So then the Board's position is that by this delay, this nascent union is being hurt by delay, and people are distrusting their idea, their wherewithal to be able to bargain for them, and time is on your side in terms of the Board's calculus in that regard. Do you agree with that? If you have a new union, and the union, they sign up, they voted for it, and then the union can't even – their perception is that you can't even get the company to even sit down with you, to even bargain with you. And the more that happens, the more they lose confidence, right? I'm not asking you to agree with that, but do you understand that position? Precedent that exists both from the Board and the circuit courts on that. And it does establish, Your Honor, an inference that in a nascent contract, non-contract situation with a new union, that there could be cases where injunctive relief would be appropriate. But that's based on a record that illustrates evidence of irreparable harm, like the things you've mentioned, such as waning support for the union or the union's inability to represent the members as a result of delayed bargaining. And that's not present in this record. So you do have a general inference that could be exercised by a district court in favor of granting injunctive relief. But in this case, the district court said beyond those general inferences, the Board doesn't have the facts to establish irreparable harm. No one has been negotiating with the union since they won, they prevailed in the election. So there have been – I would say that the hospitals have set forth a package proposal. I understand the Board's position that, you know, some of those terms are not amenable to any union. We would assert and disagree with that fact. I don't think it's necessary to establish our case here, which really centers on irreparable harm. I'll also note that, and this is a fact not in the evidence, but the parties have actually canceled the unfair labor practice hearing by joint request of the union and the employer so that instead of using the time to litigate this complaint, they can actually sit down and bargain for a full week next week. The only party who opposed that request to sit down and bargain instead of litigate was the Board itself, which I think raises questions about manufactured circumstances. Mm-hmm. Well, you know, you would agree in the sense that, getting back to the injunction, the winter factors, the four of them, right, basically, and this quick look, I will call it, maybe you may call it something different, what the district court did was, okay, I'm going to look at one of them and then sort of use the reasoning that, well, if all are required, or two main ones are required, if I find one doesn't exist, then why go through the rest of them? I mean, that seems to be the reasoning of the district court, right? Yes, Your Honor. All right. But because there's such a strong, strong national policy for good faith bargaining, for a 10-J injunction, don't you really have to look at the public interest one, that number four? That's the one often times, a lot of injunctions, you kind of get tossed aside. You kind of look at likelihood to prevail, irreparable harm, those kind of things. But this one is big. It's not just a tail wagging the dog. It really is the dog in terms of the public interest in good faith bargaining. And therefore, until you look at that in a fulsome way, and here it was looked at at all, you can't really look at what the real essence of irreparable harm is because the good faith bargaining is the harm. Your Honor, the argument you're advancing- The public, to the public. And the approach that you're advancing is one that has been accepted by other courts of appeals, the Ninth Circuit, for example. In the Fourth Circuit, that's actually been addressed. And the court here has said, we want to look at the four traditional equitable factors, just as we would- Well, we were looking at that. We weren't looking at the same thing. We were looking at, first of all, a different standard. It was, right? In Muffley- I know, I was on the panel. I know, I know. In Muffley, which was the case, it was a different standard. But really, the difference in the standard- And we weren't looking at a 10-J injunction, were we? No. Right. So it's a different calculus. As Thomas Jefferson said, not changing one's mind, but looking at it differently, I have a right to be smarter today than I was yesterday. So we're looking through a new lens of jurisprudence, aren't we? If you wanted to look at this in the way that's been adopted, for example, by the Sixth Circuit or the Ninth Circuit, certainly this case, this court could overrule the district court and change the standard. But in terms of applying the standard that exists in the Fourth Circuit, I would maintain that the district court did not abuse its discretion in a way that requires- But the Fourth Circuit has not looked at it in a 10-J context, in terms of where public policy is, as the French would say, the piece de resistance. It's very important. And that's why- And then it's like a double whammy. You said, well, if you look at just Rep. Waham, well, it's speculative what you'll get in any bargaining. Once we get to the table in good faith, there's no guarantee you'll get raises. There's no guarantee you'll get anything that's different. So therefore, you never could win if you look at a traditional irreparable harm standard, because you're ignoring what it really is meant to do in a 10-J, is to look at the public policy of thwarting or delaying or otherwise undermining good faith bargaining. Your Honor, I would respectfully disagree. There are a number of cases, and the types of historical cases where 10-J was often used were cases where you could show solid, significant, real evidence of irreparable harm, a layoff, a refusal to reinstate workers, terminations. Those are all cases where the harm is much more specific and significant. And here, it's actually the board's attempt to apply it to a case of alleged surface bargaining that makes it so unsuited for 10-J relief. But that doesn't mean that 10-J relief has no place. In those cases, did the court just stop at one factor? They were looking at a context of all. They balanced it, right? This one is, they just ignored. Likelihood of seceding, totally. Your Honor, I don't believe that the district court totally ignored the inferences. Well, we can't read minds. We only can read opinions. Right. And that's what it said. If you look at, if you think about the practical application, all of the arguments that you've asserted in favor of these inferences, an inference that the delay or the time that it takes to reach a decision causes the need for an injunction, all these inferences are typically supported by record evidence in cases where 10-J petitions are granted. Look, for example, at the Sixth Circuit decision in DHSC, which was cited to this court by the board. And I did file a response to their notice of supplemental authority. In that case, there is specific evidence that the number of people who wanted to be union officers dropped from 30-some-odd to 4. There's specific evidence with regard to how many people attended union meetings. It dropped from X number to Y number. That's the kind of evidence that the district court would need to find irreparable harm. And the district court essentially said, an inference won't cut it. You have an inference, but you typically have that supported by facts and the record. And where the facts and the record not only do not support the inferences, but actually contradict them, where you have nurses saying, nobody's come to me and said there's a problem with bargaining. I still talk to my union representative. Yes, but irreparable harm as a standard is not that you have to show that the harm has occurred, but that if you don't do that, this is what will happen. You're saying that in order to get an injunction, you have to show all of those horribles or horribles have to have occurred. That's the whole purpose. It is a prescriptive aspect of it. Say, wait a minute, if you don't do this now, this is what will happen later. You're saying, no, no, we have to prove the later has occurred in the presence to get an injunction. And that turns injunction on his head. That's why we're here now, because we don't want those things to happen. Your Honor, I understand that the standard is less than precise proof of harm, but the probability, the likelihood standard, it went up with the Supreme Court's decision in Winter. And so we're saying it's higher than what the Board's presented here. Absolutely. You're absolutely right. Winter did upgrade Blackwell. I mean, absolutely. I also want to address the concept of turning the injunctive standard on its head, because I do think that that's what the Board's approach here could potentially do. Injunctions, and specifically 10J injunctions, are supposed to be an extraordinary remedy reserved for a minimum number of cases. And it makes sense in injunctive cases to start with irreparable harm from a logical perspective, because irreparable harm is the concept that sets apart injunctive relief from a final disposition of the case. Without irreparable harm, all the other factors are essentially things that you prove in the case of a final disposition of a case. And so the Board's approach where they say, well, look at the public interest first. That's the most important. And let it guide, dictate, or interrelate with the other factors. That's going to turn injunctive relief on its head, because certainly the Board will be able to always assert a broad public interest. Well, at least hopefully they'll always be able to assert a broad public interest in the steps that they're taking in the names of federal labor policy. So starting with that factor doesn't distinguish the extraordinary remedy that is injunctive relief under Section 10J of the Act, under the precedent of the circuit. That's why not only is it acceptable, was it acceptable for the district court to start there, but it makes logical sense. And that's to stop there, too. If you underwinter... To start there, you may be right, but to stop there? Underwinter, if you can't satisfy irreparable harm alone, then you can't get injunctive relief. And that's true even before the... That's true. But text without context is pretext. To understand the whole aspect of it, don't you have to go further than just that? To understand the whole aspect of it, you need to have a full hearing before an agency that has repeatedly asserted its unique expertise in handling questions like surface bargaining. To Judge Niemeyer's point, that's the whole purpose of the agency. If we're going to take away from the agency its adjudicatory function, we may as well just not have a National Labor Relations Board, because this is the purpose of having it, is to decide these disputes, to keep them out of the court systems, and to reduce delay by having an agency. You're not taking anything from the agency. The agency is frustrated itself. That's why it's a valiant self-intended injunction. It'll be different if someone outside the agency said, listen, somebody helps me because I have an employer who just won't come to the table and accept that the union won the right to collectively bargain for the employees, and they just won't come to the table. That's, in this case, those are not the facts present. The employer has come to the table. This is not a refusal to bargain. It's a question of service. I seem to see in the record where the hospitals requested 47 different times to meet. Yes, Your Honor. And the union rejected all 47. Yes, Your Honor. And that they were, the reverse was only two times where you rejected. That's correct, and that's true, and about the number for both. And then the two main provisions over which they're so upset, the hospitals explained to the district court that they had that $800,000 verdict in Ohio that precluded providing information about employees in front of the union member because it became defamatory. Yes, Your Honor. And the management clause was, in fact, part of a contract with the same union in California. That is correct, and all of that comes from the record before the district court. But that's not, in other words, the argument, if you played it out, the argument might be it isn't much surface mining, or maybe it is. We can't conclude, but it is not so one-sided as the board would advance. Yes, Your Honor. Your argument is that in order to get into equity and the extraordinary remedy, the main and only condition for equity is first that there's irreparable harm. Otherwise, you have an adjudicatory process that you don't want to interrupt. Yes, Your Honor. I would say that that's exactly how it should be structured. I would say that at the very least, the courts have never said you have to start with any one of the particular factors. Do you concede that if, in fact, the employees are frustrated at the delay, and they would begin to drop off in the effect of the union, that would be irreparable harm? It would depend on the facts and the record, but I believe that a case like Affinity illustrates that a district court might be more willing to grant a petition where there are more facts and a record that support finding irreparable harm. But you agree, though, that that's the result, that that would be irreparable harm? I agree that there is precedent that says that that's evidence of irreparable harm. We have to agree at least on what irreparable harm would look like if it does occur, right? Yes. So what would irreparable harm look like if it... I'm not saying that I don't want you to concede that it has happened, will happen, but what does it look like if it did? Based on the precedent that has been put out by the district courts across the United States, for the most part, it looks like specific numbers. It looks like union organizers and employees who can say, nobody believes in the union anymore. Nobody is coming to the meetings. We can't come in, anyone to come to bargaining. Very specific facts that are not present in this case. That's the type of things that you see in the record before the Northern District of Ohio and the DHSC. Do you think that counsel misrepresent the record then in answering Judge Agee's question and asking Judge Agee to read further than the paragraph, the part he read at first? Was counsel misrepresenting the record when he said no? She stated that she never would have sought those type jobs but for the frustration. We know that she got a job and was closer and all those things are nicer, but that's on the other side of would not have sought but for this. Did he misrepresent the record? I would not represent the record in the same way that counsel for the board did. I would say that. It's just about the affidavit speaks for itself. I'm asking you to divine anything. Did he misrepresent the record when he said, she said that she would not have considered those but for that frustration? Is that a misrepresentation? I respectfully disagree with counsel's assertion, and I think the record illustrates that there were a multitude of factors involved. He said that. He didn't disagree with that. Matter of fact, Judge Agee was saying, well, it looks like this may have been for the hospital. And I thought counsel did a great, very noble. It's about truth. So we're not going to cherry pick people because people, that's what real life and the truth is. There are multiple things involved. But the point is, I'm asking you, did he misrepresent when she said that I wouldn't have considered those things or leaving another, seeking another job, but for that lessening or erosion in terms of faith and confidence in the union's ability to bargain? Is that a misrepresentation? Because you know the record because you wouldn't be standing before us if you didn't. With all due respect, I think it is a misrepresentation. We cannot say based on the record whether or not she left because of the better pay or the closer location or some alleged later random claim. Going down to causation and subjectivity. The question is, did she say it? Not about a causation. Did she say that? When she's made the statement in her affidavit that she was leaving a position at Greenbrier, she immediately thereafter said it was for better pay and for a better location. Later in the affidavit, she makes claims about some level of frustration with the process. I do not. I would say that the reason. I can't speak to it. I think that here's what I will say. My question because my question is too complicated because mine is, did she say it or not? That she said, I wouldn't have considered those, but for the frustration. Did she say it? I'm not asking about causation, sole reason. What? So she didn't say it, right? No. Okay, all right, good. You're saying that that's a misrepresentation. That's good. That's all I want to know. I see that my time has expired, ma'am. You're talking to the chief, so you can always keep going. Thank you, Your Honor. I will say that I think what's very clear is that the district court did not commit clear error. I think it's an important standard to keep in mind. It's a high burden. And the fact that we stand here having to parse the record about how much weight should be given to X, Y, or Z within the affidavits is evidence that the district court's findings were appropriate. The board did make the statement that they don't cherry pick what goes into affidavits and what doesn't. But what they are asking this court to do is cherry pick what evidence should have been relied on by the district court. And that's not the standard. The standard is clear error. So unless there was clear error in the way the district court interpreted the record, the district court's decision should not be overturned. I want to just also briefly discuss delay. I will take less than a minute. The board claims delay is really sort of incidental. It's not, as the judges pointed out, the centerpiece of the district court's argument. I will point out that the board said that they needed time to investigate. If you take a look at the dates on the affidavits that were provided to the board, they were provided in January and early February. So it still stands to reason a complaint could have been issued sooner. Even if you set that aside and you look at the distance between the complaint issuance and the seeking of 10-J relief, there's a four-month unaccounted-for period there where the board's only sole mission was to combine this litigation with other protracted litigation against the hospitals pending before the board, which would have caused further delay, as was noted by the administrative law judge in that case. So I think it was proper for the district court to consider that evidence. Again, it's not the mantelpiece of this decision, but I don't think the record is as one-sided as the board would lead you to believe. For all these reasons, the decision of the district court should be affirmed, and the petitions that the board has submitted for injunctive relief against the hospitals should be tonight. Thank you. Thank you, Ms. Becerra. Mr. Barrett, you have just a few minutes. I will be brief. Thank you, Your Honors. Without getting into the reading of the entire affidavit, of course, I would just direct your attention to page Joint Appendix 388, where in the relevant paragraph, paragraph number 14, the RN who left employment, R.N. O'Brien, began her statement about this, that she was leaving because nothing stays the same. There's changes made wherever the managers want it, and it's hard to work that way. It's the type of instability and uncertainty that collective bargaining can hopefully avoid, that type of unrest. She goes on to state, I don't think I would have looked for another job if there wasn't so much change and inconsistency of not knowing what to do and what to do in the department. And I think that that puts to rest any idea that my earlier statement was a misrepresentation. I would also like to point out a few other factual matters. One is that several of the affidavits that are in the record, including the second affidavit of Ms. Meadwell, J.A. 233, was taken in June of, I assume that was 2015. There was another affidavit that, several other affidavits, the affidavits of Nurse Franson and O'Brien were also taken in July. It's not as if the investigation was complete by any means prior to the issuance of the complaint. There was enough investigation at that point for the General Counsel to determine that it was appropriate to issue a complaint. However, as I indicated earlier, there are other indications, of course, that go into whether or not it's appropriate to seek 10J. That brings me to my next point, which is that the General Counsel invokes 10J on an extremely rare circumstance. It is not in every situation of bad faith bargaining or refusal to bargain in which the Board seeks 10J injunctions. So it does not take that authority lightly to come into the District Court and to expend the government's resources in seeking an injunction. And I'm not saying that that goes too far in establishing the Board's or the General Counsel's burden, only to say that it doesn't happen very often. And so it is an extraordinary remedy. The General Counsel acknowledges that it's an extraordinary remedy. I would like to correct one point earlier that I think the Chief Judge might have made, and that is that Muffley was indeed a 10J case. So I don't want the Court to think that it wasn't. So I just wanted to clarify that. And then finally, you know, here we have a certification that it issued just over five years ago. There's been some bargaining. Now, there was a statement made, I believe, at the oral argument before the District Court that the hospital had offered different dates to bargain. I don't know that that was ever confirmed through the evidence or through anything that was submitted after the fact. I believe that there was a statement made. However, at that point, there was already the taint of the bad faith bargaining. There was already an insistence that the hospitals would not agree, as Lead Negotiator Don Connolly stated. You know, my only point was that we're really not debating that because that really wasn't decided by the District Court. Yes, Your Honor. But it seemed to me that there were two major sticking points that really troubled the union. One was the absence of an arbitration clause, and the other was the management clause. And there were very legitimate responses made by counsel for the hospitals to the District Court as to those positions, and expressly stating that they were not necessarily wedded to it. They had to take account of that and figure out how to protect the hospitals from this defamation liability. And this was a serious concern. You know about that case. Yes. And so he conceded to the District Court this was unique. Most contracts have this. But we're putting that on the table because we have this very legitimate concern. And he also explained the times that you guys did meet the proposals. And the main objection was those two points that caused a real breach. And he offered to continue talking about it. But he did state that it was much more trouble for the hospitals to get in negotiating sessions with the union than the union with the hospitals. And he, I think he mentioned 47 times he proposed, and that it was only two times. The other way, he was talking about Michelle Mahon. Well, there's a few things I'd like to respond to. And that is, it is true that the hospital, after having been found guilty of engaging in defamation and having a large verdict entered against it, wanted to avoid that situation in the future. And its method of avoiding that situation was both with respect to any discussion of arbitration and any negotiation or provision of information about a discharged nurse. I don't think that's fair to the record. It didn't say, it says we're not going to agree to that portion of the package. We want to have a whole package. That's number one. And number two, there was an explicit statement to the District Court. That is our position now. And it might change depending on what we can work out. So you know, this is arguing the service argument. And obviously, the union has the right to make those arguments and felt frustrated also. But so was the hospital felt frustrated. They agreed to a mediator, didn't they, for the October session? I believe so, yes, Your Honor. And so that's a pretty good step, I think, for the parties. And what is not a good step is to insist on a permissive subject of bargaining, such as an indemnification clause, and to state, absent that, we're not agreeing to this. Now it's the same issue. You know, everything has two sides to it. Of course, my own point is, your brief came across as if these people just stonewalled and didn't like the labor laws. Well, they've been in this a lot. They have a lot of agreements around the country. And they explained exactly what their position was to the District Court. We're not arguing the substance of this. But the District Court said, you know, we have to decide whether the injunction is meaningful to the remedial power of the board. And it said, that power of the board is not irreparably being damaged. And that's, it made a judgment call. And our task is to decide whether that was an abuse. But I don't need to argue the substance with you. And I don't want to engage you. I don't want to press you on that point, because it's unfair for you, because it's not been briefed. And the District Court didn't rely on whether there was good faith in negotiating or not. My only point is that the record is not developed on that yet. Well, and if I could just respond to just Nehemiah's comment. Pardon? You may respond. Well, I mean, I guess my response is that I think it is more clear than it may seem, or than the hospitals may suggest, that they began with a hard bargaining position. And then they took an illegal bargaining position after that, a bad faith position of insisting on permissive subjects. I think that it is no small thing that after they discharged a nurse, and objectively speaking, there is, I don't believe that there is any disagreement, that at that point, they were obligated to furnish the union with the information the union had requested about that discharge. It was a very specific request. They discharged her for attendance problems. The union asked them to back that up with documents about her attendance problems. And the hospital refused to do so. They refused to allow the union to carry out a representational role. And the attendance of other nurses. And the attendance of other nurses, which goes to the disparate treatment of this nurse. And it is well established that this is the type of information that the union was entitled to. And what that tells Nurse Jackson, as she's out of a job, and other nurses who might be confronting a similar situation, is that the union that they just elected has no power. That the company can say no, and there's nothing the union can do about it, until potentially years later, if there's a bargaining order, long after that nurse has been discharged, and potentially after other nurses, such as O'Brien, has left the property. And that is the type of harm that cannot be remedied in a bargaining order somewhere down the road. But it is in those limited instances that the General Counsel invokes 10-J. And that is what has brought us here to you. So I will thank you for your time. I'm happy to answer any other questions, of course. But without that, thank you. Thank you, Counsel. We'll have a brief recess. This Honorable Court will take a brief recess.
judges: Roger L. Gregory, Paul V. Niemeyer, G. Steven Agee